United States District Court

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UACC MIDWEST, INC., et al.,

                Plaintiffs,

   v.

CITY OF SANTA CRUZ, et al.,

                Defendants.
                                    /

No. C 84-07546 SI

**ORDER DENYING PLAINTIFFS'
MOTION REQUESTING
CONFIRMATION THAT THE CONSENT
JUDGMENT TERMINATES ON JULY
28, 2009**

On January 19, 2007, the Court heard argument on plaintiffs' motion requesting confirmation that the consent judgment terminates on July 28, 2009. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court DENIES plaintiffs' motion.

**BACKGROUND**

This matter involves litigation spanning more than 20 years between the City and County of Santa Cruz (hereinafter "Santa Cruz" or "defendants") and various cable companies that have provided cable service in Santa Cruz (the most recent being Comcast of California/Massachusetts/Michigan/Utah, Inc. and Comcast of Santa Cruz, Inc. (collectively "Comcast")). After the cable companies filed suit against Santa Cruz, the parties entered into a Stipulation and Consent Judgment on October 14, 1988. *See* Consent Judgment (Defs' Ex. 1). The heart of the Consent Judgment is a rate structure that limits the monthly charges plaintiffs may charge cable customers in Santa Cruz. The sections of the Consent Judgment most pertinent to the instant motion are as follows:

Except as set forth below, Santa Cruz shall forego any and all rate regulation to which they may be legally entitled for the term of the First Amended Franchise Agreement dated [blank], 1988, between Greater Santa Cruz Cable TV Associates, Inc. ("GSC") and

United States District Court

For the Northern District of California

the City of Santa Cruz and the First Amended Franchise Agreement dated [blank], 1988, between GSC and the County of Santa Cruz (together, the "Franchise Agreements.")

*Id.* at 3:23-4:2.

In consideration of these limitations regarding the Basic Rate, Santa Cruz expressly agrees that they relinquish and forego all right and power to control or regulate any of [defendant]'s rates, . . . *for the term of the Franchise Agreements.*

*Id.* at 8:5-11 (emphasis added). The Consent Judgment divides the rate limitations into three basic time periods. *See* Consent Judgment, Ex. A (rate schedule divided into three columns: "Start," "Construction Program," and "Thereafter"). The Consent Judgment defines the final time period, "Thereafter," as "that period of time commencing with the first anniversary of the completion of construction as defined in the Stipulation and Consent Judgment *through the duration of the Franchise Agreements.*" *Id.*, Ex. A at n.3 (emphasis added).

Other relevant provisions include:

V. Continuing Jurisdiction of Court. The parties hereto agree that this Court shall have continuing jurisdiction *until the expiration of the franchise term of the Franchise Agreements* to enforce the terms of this Stipulation and Consent Judgment entered pursuant thereto.

*Id.* at 13:9-13 (emphasis added).

This Stipulation and Consent Judgment can be changed, altered and modified in any respect, only by instrument in writing and signed by the party against who enforcement of any waiver, modification, or discharge is sought and approved by this Court.

*Id.* at 17:2-6.

The Franchise Agreements referenced in the Consent Judgment (attached as defendants' Exhibits 4 and 5), each contain the following definition of the "franchise term":

18. <u>Franchise Term.</u>  The term of the Franchise shall be 20 years from the Effective Date.  Notwithstanding the foregoing or Section 626 of the Cable Act, if (i) Grantee rebuilds or upgrades the Cable System at any time prior to the twentieth anniversary of the Effective Date of the Franchise or (ii) Grantee and Grantor mutually agree that such rebuild or upgrade is not necessary to meet the cable related needs of Grantor and the Subscribers, Grantee shall be entitled to an automatic 10-year extension to the term of this Franchise, unless Grantee has already received an extension pursuant to Section 5.24.070(B) of the [County] Ordinance.

Ex. 4 at 21; Ex. 5 at 21 (emphasis in original).

Section 5.24.070(B) of the County Ordinance (defendants' Exhibit 7), referenced by the Franchise Agreements, states in pertinent part: "Grantee shall be entitled to an automatic three-year

**United States District Court**

For the Northern District of California

1   extension of the Franchise for implementing any material changes not required by the Franchise

2   Agreement or Ordinance." Ex. 7 at 13 (Subsection (1)(c)). "Grantee shall be entitled to an automatic

3   extension of the Franchise of ten years for such major redesign, re-engineering or reconstruction that it

4   makes pursuant to this Section that were not previously required by the Franchise Agreement or

5   Ordinance." Ex. 7 at 14 (Subsection (2)(e)).

6          Comcast has brought this motion because, according to its calculation, the Franchise Agreements

7   expire on July 28, 2009. Pursuant to Section 626 of the Cable Communication Policy Act of 1984

8   ("Section 626") – which establishes the procedures by which cable companies seek, and localities grant,

9   franchise renewals – defendants must make a written renewal request to Santa Cruz on or before January

10   28, 2007 (thirty months before expiration of the current Franchise Agreements).[1] *See* 47 U.S.C. § 546.

11   Comcast fears that if it renews the franchises pursuant to Section 626, Santa Cruz will attempt to

12   construe such renewal as an extension of the franchise terms, and thereby an extension of the Consent

13   Judgment. Comcast therefore seeks a declaration from this Court that "(1) the Court's jurisdiction [over

14   the Consent Judgment] shall terminate on July 28, 2009 . . . , and (2) Comcast's exercise of its Section

15   262 renewal rights and/or a grant of renewal pursuant to Section 626 will not effectively extend the

16   Court's jurisdiction under the Consent Judgment." Mot. at 2:6-9. In opposition, Santa Cruz argues that

17   (1) this dispute is not ripe for adjudication; (2) there is an incomplete factual record on which to decide

18   this dispute; (3) the parties to the Consent Judgment did not intend for July 28, 2009, or any other fixed

19   date, to constitute an absolute expiration or termination date of the franchise term or of this Court's

20   jurisdiction; and (4) Comcast has not shown sufficient changed circumstances to warrant extinguishment

21   of the Consent Judgment. For the following reasons, the Court agrees with Santa Cruz, and DENIES

22   plaintiffs' motion.

23

24   ///

25

26

27          [1]At oral argument, counsel for Comcast acknowledged that Santa Cruz had offered to extend this
       deadline for making a written renewal request by six months. Counsel for Santa Cruz repeated this offer
28     on the record.

United States District Court

For the Northern District of California

**LEGAL STANDARD**

**1.     Enforcement of settlement agreements**

The courts have broad equitable power to enforce settlement agreements.  *See TNT Marketing, Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir. 1986) ("The district court ha[s] inherent power to enforce the agreement in settlement of litigation before it").  "The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1989); *see also Gates v. Rowland*, 39 F.3d 1439, 1444 (9th Cir. 1994).  California law applies to a determination regarding the scope of the Settlement Agreement even though the underlying cause of action is federal.  *See United Commercial Ins. v. Paymaster Corp.*, 962 F.2d 853, 857 (9th Cir. 1992).  Under California law, the goal of contractual interpretation is to give effect to the mutual intention of the parties.  *See Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992).  The mutual intention of the parties is determined by examining factors including the words used in the agreement, the surrounding circumstances under which the parties negotiated or entered into the contract, and the subsequent conduct of the parties.  *See Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (1998); *Hernandez v. Badger Construction Equipment Co.*, 28 Cal. App. 4th 1791, 1814 (1994).

**2.     Ripeness**

The role of the courts "is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (*en banc*) (citing U.S. Const. art. III).  Ripeness and standing are two related concerns arising out of the case or controversy requirement. *See id.*; *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982). Ripeness is "peculiarly a question of timing," *Regional Rail Reorg. Act Cases*, 419 U.S. 102, 140, (1974), designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967).  "Although ripeness, like other justiciability doctrines, is 'not a legal concept with a fixed content or susceptible of scientific verification,' the Supreme Court has observed that the doctrine 'is drawn both from Article III limitations on judicial

4

United States District Court

For the Northern District of California

power and from prudential reasons for refusing to exercise jurisdiction.'" *Thomas*, 220 F.3d at 1138 (citations omitted).

"The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong."[2]  *Id.* "[B]ecause the focus of our ripeness inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline." *Id.* (citing cases). "The overlap between these concepts has led some legal commentators to suggest that the doctrines are often indistinguishable." *Id.* (citing Erwin Chemerinsky, A Unified Approach to Justiciability, 22 Conn. L. Rev. 677, 681 (1990). In "measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing." *Id.* at 1139 (quoting Gene R. Nichol, Jr., Ripeness and the Constitution, 54 U. Chi. L. Rev. 153, 172 (1987)).

"Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Id.* (quoting *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)). "In assuring that this jurisdictional prerequisite is satisfied, we consider . . . whether the alleged injury is too 'imaginary' or 'speculative' to support jurisdiction." *Id.*

Where a plaintiff seeks to challenge the constitutionality of a statute that has not been enforced against it, "neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the 'case or controversy' requirement." *Id.* (citing *San Diego County Gun Rights Comm. v.*

---

[2]Standing is an essential and unchanging part of the case-or-controversy requirement of Article III of the Constitution. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The determination of standing involves constitutional limitations on federal court jurisdiction and prudential limitations on its exercise. *Warth v. Seldin*, 95 S. Ct. 2197, 2205 (1975).
   In order for a plaintiff to have standing, the plaintiff must allege (1) an "injury in fact," (2) that is fairly traceable to the defendant's conduct, and (3) that a favorable court decision would redress the injury. *See Lujan*, 504 U.S. at 560 (1992). An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (internal citations and quotations omitted). The absence of any one element deprives a plaintiff of Article III standing and requires dismissal. *See Whitmore v. Federal Election Comm'n*, 68 F.3d 1212, 1215 (9th Cir. 1995). The burden of establishing constitutional standing rests with the party invoking federal jurisdiction. *See Lujan*, 504 U.S. at 561. Standing will not be found where speculative inferences are necessary to establish injury or a connection between the alleged injury and the act challenged. *See Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976); *Johnson v. Weinberger*, 851 F.2d 233, 235 (9th Cir. 1988).

*Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996)).   Ripeness requires a "genuine threat of imminent prosecution." *San Diego*, 98 F.3d at 1126.   "In evaluating the genuineness of a claimed threat of prosecution, we look to [1] whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, [2] whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution or enforcement under the challenged statute." *Thomas*, 220 F.3d at 1139.   Under the first prong, "the Constitution requires something more than a hypothetical intent to violate the law. . . .   A general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan." *Id.*   Under the second factor, a specific threat of enforcement, "[a]lthough we do not always require plaintiffs to await arrest or prosecution before entertaining a challenge to the constitutionality of a statute, the threat of enforcement must at least be 'credible,' not simply 'imaginary or speculative.'" *Id.* at 1140 (citations omitted).   A threat is insufficient if it "is wholly contingent upon the occurrence of unforeseeable events." *Id.*

The ripeness inquiry also focuses on prudential concerns.   "Prudential considerations of ripeness are discretionary." *Id.* at 1142.   "In evaluating the prudential aspects of ripeness, our analysis is guided by two overarching considerations: 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Id.* at 1141 (quoting *Abbott Laboratories*, 387 U.S. at 149).   Where an issue is presented "devoid of any specific factual context," the "case [is] unfit for judicial resolution." *Id.*   "A concrete factual situation is necessary to delineate the boundaries of what conduct the government may or may not regulate." *San Diego*, 98 F.3d at 1132.   Where an issue does not turn on pure legal interpretations, the "challenge presented . . . requires an adequately developed factual record to render it ripe for our review." *Thomas*, 220 F.3d at 1142.   "The hardship analysis of our ripeness jurisprudence dovetails, in part, with the constitutional consideration of injury. Although the constitutional and prudential considerations are distinct, the absence of any real or imminent threat of enforcement, particularly criminal enforcement, seriously undermines any claim of hardship." *Id.*

**DISCUSSION**

Comcast first argues that the clause in the Consent Judgment granting this Court "continuing jurisdiction," *see* Consent Judgment at 13:9-13, overrides the constitutional "case or controversy"

**United States District Court**
For the Northern District of California

1    requirement. The Court disagrees. While the courts certainly have broad power to enforce and interpret

2    settlement agreements, Comcast cites no authority for the proposition that this power allows the courts

3    to issue advisory opinions with respect to such settlement agreements. *See TNT Marketing, Inc. v.*

4    *Agresti*, 796 F.2d 276, 278 (9th Cir. 1986) ("The district court ha[s] inherent power to enforce the

5    agreement in settlement of litigation before it"). Comcast's argument would lead to the untenable

6    conclusion that either party to this Consent Judgment could, for example, request the Court's

7    interpretation of the word "effective," on line 8 of page 15 of the Consent Judgment, simply because it

8    is curious. The court's power to enforce a settlement agreement is no broader than its Article III power

9    to adjudicate cases and controversies.

10        Consequently, the Court must decide whether Comcast's motion presents a justiciable case or

11   controversy. Comcast's motion essentially asks the Court to decide whether Comcast will be bound to

12   the Consent Judgment after July 28, 2009. Comcast presumably wants this issue determined so that it

13   knows whether, two-and-a-half years from now, it can raise its cable rates for Santa Cruz County

14   customers without violating the Consent Judgment and ending up back in court. Comcast's motion fits

15   the form of the prototypical request for an advisory opinion: "If we engage in certain, unspecified

16   conduct, far in the future, will we be in violation of the law?"

17        Comcast's request is somewhat analogous to a preemptive challenge of a statute; it asks the

18   Court to decide the validity of a potentially enforceable legal instrument, based on a party's concern that

19   the legal instrument will be enforced against it in the future. As discussed above, in such a case, there

20   must be a "genuine threat of imminent prosecution." *San Diego*, 98 F.3d at 1126. "In evaluating the

21   genuineness of a claimed threat of prosecution, we look to [1] whether the plaintiffs have articulated a

22   'concrete plan' to violate the law in question, [2] whether the prosecuting authorities have

23   communicated a specific warning or threat to initiate proceedings, and [3] the history of past prosecution

24   or enforcement under the challenged statute." *Thomas*, 220 F.3d at 1139. Here, there is no evidence

25   to support either of the first two factors. Comcast has not presented a "concrete plan" to violate the rate

26   schedule defined in the Consent Judgment after July 28, 2009. Similarly, Santa Cruz has not

27   "communicated a specific warning or threat" that it will seek to enforce the Consent Judgment if

28   Comcast raises its rates after July 28, 2009. Absent these two factors, the fact that Santa Cruz has sought

United States District Court

For the Northern District of California

1   to enforce the Consent Judgment in the past is of little import.

2        The prudential ripeness concerns also counsel against adjudicating this issue.  First, this issue

3   is not particularly fit for judicial decision at this time.  Determining when the Consent Judgment

4   terminates requires both a legal and a factual inquiry.  As discussed above, the Court's jurisdiction over

5   the Consent Judgment, and the rate limitations of the Consent Judgment, extend "until the expiration

6   of the franchise term of the Franchise Agreements."  Consent Judgment at 13:9-13.  The Franchise

7   Agreements define the franchise term as "20 years from the Effective Date."  Ex. 4 at 21; Ex. 5 at 21.

8   The Franchise Agreements also provide, however, that the "Grantee shall be entitled to an automatic 10-

9   year extension to the term of this Franchise," if it makes certain improvements, as defined in both the

10  Franchise Agreements and the County and City Ordinances.  *Id.*  Comcast asserts that "[w]hile certain

11  events might arguably result in an extension of the franchise or the Franchise Agreement, there is no

12  basis for assuming that the Consent Judgment would necessarily and automatically be extended as well."

13  Reply at 8:17-20.  The Court disagrees.  The Franchise Agreements clearly state that certain actions will

14  add an "automatic . . . extension to the term."  Ex. 4 at 21; Ex. 5 at 21.  These extensions are provided

15  for in the section of the Franchise Agreements entitled "Franchise Term."  *Id.*  The default "franchise

16  term" is thus "20 years from the Effective Date," but may be automatically extended in several

17  situations.

18       Had the drafters of the Consent Judgment intended it to terminate "20 years from the Effective

19  Date," without exception, they could have so stated.  They did not; nowhere does the Consent Judgment

20  mention a 20 year term.  Instead, they chose to explicitly link the term of the Consent Judgment to the

21  term of the Franchise Agreements.  Comcast's statement that "the Consent Judgment explicitly states

22  it will last for twenty years," is thus incorrect, and borders on being disingenuous.  Reply at 5:14-15.

23       In order for this Court to determine when the Consent Judgment expires, it must determine when

24  the term of the Franchise Agreements ends.  In order to do so, the Court must also determine whether

25  there have been any automatic, or other, extensions of the term of the Franchise Agreements. Santa Cruz

26  suggests that there may, in fact, have been such an automatic extension of the term, as Comcast has

27  completed a rebuild or upgrade of the relevant systems.  *See* Oppo. at n.5.  This is, however, a factual

28  issue, on which the parties have presented little, if any evidence.  Furthermore, the 20 year base term of

the Franchise Agreements does not end for another 30 months. There is no guarantee that within that time, the term will not be extended. This issue is therefore unfit for judicial determination at this time, as the "concrete factual situation" has not fully developed, *see San Diego*, 98 F.3d at 1132, and the "challenge presented . . . requires an adequately developed factual record to render it ripe for our review," *Thomas*, 220 F.3d at 1142. This prudential factor weighs against a finding of ripeness.

The other prudential consideration, hardship, also weighs against ripeness. As an initial matter, Comcast provides no explanation of the hardship it seeks to avoid by bringing this motion at this time. It does not explicitly state what decisions or actions hinge on this issue. The Court can only presume that Comcast is bringing this motion in order to determine whether it will file a Section 626 renewal request later this month. Perhaps, if the Court were to rule that a Section 626 renewal would extend the Consent Judgment, then Comcast would not file a renewal notice.

If the Court refuses to adjudicate this motion at this time, then Comcast will presumably move forward with filing a renewal. After July 28, 2009, Comcast might then desire to raise its cable rates in Santa Cruz. Santa Cruz might then attempt to charge Comcast with violating the Consent Judgment. At that point, the issue of how long the Consent Judgment lasts would be ripe, and could be adjudicated. Comcast might then potentially be held in breach of the Consent Judgment. Such a result could be avoided, Comcast presumably contends, if the Court ruled on this issue today. In sum, the hardship that Comcast seeks to avoid is being held in breach of the Consent Judgment.[3] This will only happen if: (1) it successfully seeks renewal; (2) it continues to provide cable service in Santa Cruz two-and-a-half years from now; (3) it seeks to raise its cable rates two-and-a-half years from now; (4) Santa Cruz determines that Comcast should not be allowed to raise its rates under the Consent Judgment; (5) Santa Cruz decides to assert its claim in a legal action; and (6) the Court determines at that point that the Consent Judgment extended beyond July 28, 2009, and applies to Comcast's actions. There are thus at least six necessary conditions which must be fulfilled before any hardship befalls Comcast as a result of this Court declining to rule on this issue, at this time. This factor therefore weighs against a finding of ripeness. *See Thomas*,

---

[3]In theory, the cost of proceeding with the Section 626 process might also constitute a hardship. Comcast does not make this argument, however, and never states that it would forego the renewal process if the Court were to make an adverse ruling on this motion.

220 F.3d at 1142 ("The hardship analysis of our ripeness jurisprudence dovetails, in part, with the constitutional consideration of injury. Although the constitutional and prudential considerations are distinct, the absence of any real or imminent threat of enforcement, particularly criminal enforcement, seriously undermines any claim of hardship."); *see also Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996) ("[A] case is not ripe where the existence of the dispute itself hangs on future contingencies that may or may not occur.").

Constitutional and prudential considerations weigh heavily against a finding of injury, standing, and ripeness at this time. The Court is therefore compelled to DENY plaintiff's motion.

**CONCLUSION**

For the foregoing reasons, the Court finds that this issue is not ripe for adjudication. The Court therefore DENIES plaintiffs' motion requesting confirmation that the Consent Judgment terminates on July 28, 2009, without prejudice.

**IT IS SO ORDERED.**

Dated: January 22, 2007

_____
SUSAN ILLSTON
United States District Judge

10